849 P.2d 946

**Earl M. HARDY, individually and as successor in interest to Box Canyon Trout Co., a dissolved corporation, Petitioner–Appellant–Cross Respondent,**

v.

**R. Keith HIGGINSON, Director, Idaho Department of Water Resources, Respondent–Cross Appellant.**

No. 19262.

Supreme Court of Idaho, Boise, January 1993 Term.

March 25, 1993.

Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for appellant. William F. Ringert, argued.

Larry J. EchoHawk, Atty. Gen., Phillip J. Rassier, Deputy Atty. Gen., Dept. of Water Resources, Boise, for respondent. Phillip J. Rassier, argued.

REINHARDT, Justice Pro Tem.

Earl Hardy (Hardy) appeals the appellate decision of the district court which affirmed in part the decision of the Director of the Idaho Department of Water Resources (IDWR) allowing Hardy to amend his two existing water permits. Affirmed in part and remanded for further findings.

The facts of this case are not in dispute. Hardy holds two water permits to divert water from Box Canyon Creek to Blind Canyon for the purpose of fish propagation. The first permit, NO. 36–7091, was granted in 1971 and established a single point of diversion for 300 c.f.s. The second permit, NO. 36–7334, was granted in 1975 and established six points of diversion for 600 c.f.s. Five of Hardy's points of diversion are located at or below a natural sculpin pool in Box Canyon Creek,[1] and the other two are located above the sculpin pool. In 1988, Hardy applied for an application to amend his water permits to secure an additional point of diversion which would coincide with a right-of-way granted by the Bureau of Land Management (BLM) over BLM land adjacent to Box Canyon Creek. This proposed point of diversion is located downstream from the sculpin pool.

Upon receipt of Hardy's application, the Director of the Idaho Department of Water Resources (Director) published statewide notice seeking protests against approval of the proposed amendments. Twelve protests were filed on the basis that the proposed amendments were against the public interest. Hardy filed a motion to dismiss the protests on the grounds that the public interest was not a proper basis for protest. The Director denied the motion.

A hearing was held on September 28, 1988. Hardy renewed his motion to dismiss the protestants, which was again denied. At the hearing, Hardy testified that the proposed amendments would not result in an increased use of water, nor would they adversely affect the water rights of others. Hardy also submitted the testimony of Robert Cordell, the BLM Resource Area Manager for the Box Canyon area, who testified that in BLM's estimation, the proposed point of diversion was preferable over the existing points of diversion as far as environmental considerations were concerned, and that there would be no adverse environmental impacts other than those already identified and addressed by BLM. The "Right-of-Way/Temporary Use Permit" issued by BLM, and an environmental assessment prepared by BLM, were placed in the record to establish which environmental factors the BLM took into consideration in granting Hardy's right-of-way. The only other significant testimony came from the protestants which generally stressed that the new diversion would be contrary to the local public interest because of the adverse impacts on aesthetics, recreation and fishing. None of the protestants lived or owned property in Box Canyon.

In an order and amended order issued November 29, 1988, and February 17, 1989, respectively, the Director approved the proposed amendments. However, based on the local public interest, the Director im-

1. The Shoshone sculpin is a small fish which requires cold, clean water and has very specific food and cover requirements. The natural sculpin pool referred to in the text is the primary habitat area for the Shoshone sculpin in Box Canyon Creek.

**488**

posed various conditions on the amended permits. The Director stated that Hardy must abandon his approved points of diversion located at and below the sculpin pool once all the required approvals for use of the new point of diversion were given. As to the two points of diversion located above the sculpin pool, the Director ruled that the local public interest required Hardy to divert water from these points only "to the extent that such diversion can occur without increasing or decreasing the water levels, temperature, quality, and/or flow velocity within the natural sculpin pool located downstream." The Director also ordered Hardy to construct a measuring device at the new point of diversion to measure the amount of water entering the new diversion. This condition was in addition to a similar condition imposed by the BLM in granting Hardy's right-of-way which required Hardy to construct a measuring device at the proposed diversion to assure a minimum stream flow of 75 c.f.s.

Hardy appealed the Director's decision to the district court which affirmed the authority of the IDWR to consider the local public interest in proceedings to amend a water permit under I.C. § 42–211. However, the district court determined that the Director's condition requiring Hardy to abandon his points of diversion located at and below the sculpin pool upon all the required approvals was inappropriate. The district court also questioned the necessity of requiring the installation of a permanent measuring device at the new point of diversion in light of the fact that the BLM right-of-way required Hardy to install a structure to verify a 75 c.f.s. minimum bypass flow. Finally, the district court determined that the Director's condition imposed on Hardy's points of diversion above the sculpin pool was not supported by the record because there were no findings, outside a general conclusion that the sculpin are sensitive to water changes, as to what might be required to protect the sculpin pool. Accordingly, the district court issued an order of remand to allow the IDWR to conduct further proceedings and to make further findings regarding the need for limiting the amount of water Hardy may divert from the points of diversion above the sculpin pool, and for the need to install a permanent measuring device beyond that required by the BLM.

Hardy appeals the district court's decision and order of remand, raising the following issues:

1. Whether the Director may consider the local public interest in amending a water permit under I.C. § 42–211.

2. Whether the Director properly imposed the condition limiting the amount of water that Hardy can divert from his points of diversion located above the sculpin pool.

3. Whether the Director properly imposed the condition requiring Hardy to place a measuring device at the new point of diversion.

The IDWR has filed a cross-appeal, raising the following issue:

1. Whether the Director properly imposed the condition requiring Hardy to relinquish his points of diversion located below the sculpin pool upon receiving all the necessary approvals for use of the new point of diversion.

I.

STANDARD OF REVIEW

 In an appeal from an agency decision, we review the agency's decision independently of the district court's decision and our review is limited to the record. *Dovel v. Dobson*, 122 Idaho 59, 831 P.2d 527 (1992); *St. Alphonsus Med. Ctr. v. Canyon County*, 120 Idaho 420, 816 P.2d 977 (1991). Under I.C. § 67–5215(g), this court can reverse or modify an agency decision only in limited circumstances such as when the agency's decision is affected by error of law, is clearly erroneous in view of the whole record, or is found to be arbitrary or capricious. In addition, if the record is insufficient to support the agency's decisions, we can reverse the decision or remand the case for further proceedings. *Dovel v. Dobson, supra; Idaho County Nursing Home v. Department of Health and Welfare*, 120 Idaho 933, 821

P.2d 988 (1991); *Love v. Board of County Commr's*, 105 Idaho 558, 671 P.2d 471 (1983).

## II.

### LOCAL PUBLIC INTEREST UNDER I.C. § 42-211

The Director placed conditions upon Hardy's water permits to protect the local public interest. The director determined that he could consider the local public interest under I.C. § 42-211 because: (1) he was required to give notice and address protests under the provisions of the third paragraph of I.C. § 42-211, which refers to I.C. § 42-203A, which in turn refers to the local public interest; and (2) he could consider the local public interest when considering whether the "rights of others would be adversely affected" by the proposed amendment as directed in the first paragraph of I.C. § 42-211. The Director also concluded that persons filing a protest based on local public interest grounds do not have to own property or have a water right in Box Canyon.

Hardy argues that because he was amending a permit and not applying for a new permit, the Director was confined to the language of I.C. § 42-211, which does not include the phrase "local public interest." Hardy maintains that the deletion of the phrase "local public interest" from I.C. § 42-211 indicates that the legislature only intended the director to consider the effect of the amendment on the water rights of others and to determine whether the change would result in the diversion and use of more water than originally permitted. Hardy also argues that the Director's determination that the protestants could file protests based on the local public interest, even though they do not own property or water rights in Box Canyon, is contrary to the definition of "local public interest" set forth in I.C. § 42-203A as "the affairs of the people in the area directly affected by the proposed use."

The IDWR, on the other hand, maintains that if the Director, in his discretion under paragraph one of I.C. § 42-211, deems it appropriate to publish notice, then such notice shall be published in the manner provided in paragraph three of I.C. § 42-211. The third paragraph of I.C. § 42-211 states that protests may be filed against the application for amendment and heard by the Director in the same manner as provided in I.C. § 42-203A, which allows for consideration of the local public interest. The IDWR argues that this is the most reasonable construction of I.C. § 42-211 because this construction is consistent with the statutory scheme announced by the legislature.

 We find the IDWR's position to be the most persuasive. Under I.C. § 42-203A, any application to appropriate water in Idaho is subject to the local public interest standard. Likewise, any change to a water right under I.C. § 42-222 is also subject to a determination that the change is in the local public interest as stated in I.C. § 42-203A. To say that an amendment to a water permit under I.C. § 42-211 is not subject to a local public interest investigation would allow a prospective water user to circumvent this criterion. It is clear from the legislative scheme that this result was not intended.

 Regarding the Director's conclusion that the protestants in this case were proper parties despite the fact that they do not have water rights in Box Canyon, we find the case of *Shokal v. Dunn*, 109 Idaho 330, 707 P.2d 441 (1985), to be instructional. In *Shokal*, this Court found that the legislature intended the public interest on the local scale to include the public interest elements listed in I.C. § 42-1501 which includes the protection of fish and wildlife habitat. The Court further stated:

> By using the general term "the local public interest," the legislature intended to include any locally important factor impacted by proposed appropriations.

> . . . . .

> For example, in an area heavily dependent on recreation and tourism *or specifically devoted to preservation in its natural state*, [IDWR] may give great consideration to the aesthetic and *envi-*

*ronmental ramifications* of granting [or amending] a permit which calls for substantial modification of the landscape or stream.

109 Idaho at 338–39, 707 P.2d at 449–50 (emphasis added).

In this case, the Box Canyon area is designated by the BLM as an Area of Critical Environmental Concern (ACEC). The values justifying the ACEC designation include the identification of four candidate threatened and endangered aquatic species, one of which is the Shoshone sculpin, and the scenic and unique natural qualities of the area. Clearly, the protection of this habitat falls within the local public interest as defined in *Shokal.* The protestants, although having no water rights within Box Canyon, sought to protect these locally important factors and thus their interests were properly considered by the Director.

### III.

### CONDITIONS IMPOSED ON POINTS OF DIVERSION ABOVE THE SCULPIN POOL

■ The Director conditioned the amount of water Hardy could divert from his points of diversion above the sculpin pool "to the extent that such diversion can occur without increasing or decreasing the water levels, temperature, quality, and/or flow velocity within the natural sculpin pool located downstream." Hardy argues that it was error for the Director to place a condition on these points of diversion because they are a part of a previously approved water permit which constitutes a vested right or a contractual right to divert water which cannot be interfered with by a retroactive application of the local public interest standard.[2] As support for his argument, Hardy cites to I.C. § 42–204 which reads in part as follows:

The department of water resources shall issue a permit for any approved application, make a record of the approval and provide a copy of the permit to the appli-

cant, who shall be authorized, on receipt thereof, to proceed with the construction of the necessary works for the diversion of such water, and to take all steps required to apply the water to a beneficial use and perfect the proposed appropriation.

The district court disagreed with Hardy, finding that "any application to amend a permit offers the entire permit to the IDWR for review, and since the rights are inchoate at this time, the entire permit is subject to scrutiny under the public interest considerations added to the statutes after the original permits were issued." We agree with the rationale of the district court.

In *Big Wood Canal Co. v. Chapman,* 45 Idaho 380, 263 P. 45 (1927), the Court held that there was no retroactive application of a statute which extended the time for making proof of application of water to a beneficial use because the affected permittee in that case had only an inchoate or contingent right which was vulnerable to being abridged or modified by law. In describing the type of right a water permittee has, the Court stated:

By application for permit ... the permittee secures an inchoate right which will ripen into a legal and complete appropriation by compliance with the statutory steps. Such right is merely a contingent right, which may ripen into a complete appropriation, or may be defeated by a failure of the holder to meet the statutory requirements. The permit, therefore, is not an appropriation of the public waters of the state. It is not real property. It is merely a consent given by the state to construct and acquire real property.

45 Idaho at 402, 263 P. at 52. Likewise, in *Hidden Springs Trout Ranch, Inc. v. Allred,* 102 Idaho 623, 636 P.2d 745 (1981), the Court held that an applicant for a water permit did not possess the type of vested rights which were immune to subsequent legislation. Although the Court specifically noted that it was not addressing

---

**2.** Hardy's original permits were issued in 1971 and 1975. The local public interest standard

was included in I.C. § 42–203A in 1978.

the situation where a water permit is involved, the Court defined an applicant's rights as inchoate rights "which may ripen into a vested interest following proper statutory adherence." 102 Idaho at 625, 636 P.2d 745.

 Because Hardy's water permits only give him an inchoate or contingent right to put the water to a beneficial use, it was not improper for the Director to impose conditions upon his whole permit based on the local public interest. However, this is not to say that a permittee requesting an amendment to a water permit must accept the conditions imposed by the Director at the risk of losing any previously approved points of diversion. If a permittee finds the conditions to be unsatisfactory, the permittee should be allowed to withdraw the application for amendment and be left with what the permittee had before submitting the application to the IDWR. Similarly, a permittee should be allowed to appeal any conditions imposed by a Director, to ensure that such conditions were not imposed unreasonably or arbitrarily, without fear of losing the State's consent to put the water to a beneficial use under the terms of the original permit.

Given that the Director was entitled to place the condition on Hardy's points of diversion above the sculpin pool, Hardy next argues that the condition itself is not supported by the evidence contained in the record and therefore is clearly erroneous under I.C. § 67–5215(g)(5).

 The determination of what elements of the public interest are impacted, and what the public interest requires, is committed to the sound discretion of the Director. *Shokal v. Dunn,* 109 Idaho 330, 707 P.2d 441 (1985). It is apparent in this case that the Director considered the protection of the natural sculpin pool to be in the public's interest. Accordingly, the Director conditioned the amount of water Hardy could divert so as not to affect "the water levels, temperature, quality and/or flow velocity" of the sculpin pool. Although we find no abuse of discretion in the Director's attempt to protect the sculpin pool, we fail to find any evidence in the

record which requires a condition which in effect prohibits Hardy from diverting any water above the sculpin pool.

In granting Hardy's right-of-way, the BLM required that Hardy "take no actions which will increase or decrease water levels, temperature, quality, and/or flow velocity within the natural sculpin pool upstream of the authorized impoundment pool." However, the BLM condition, by its terms, did not apply to Hardy's points of diversion above the sculpin pool. The Director's condition appears to be an attempt to extend greater protection to the sculpin pool than that provided by the BLM right-of-way. The IDWR argues that because the Director's condition is based on the BLM condition, and because Mr. Cordell testified that BLM anticipated that there would be no diversion by Hardy above the sculpin pool, the factors taken into consideration for the BLM right-of-way, as set forth in the "Right-of-Way/Temporary Use Permit" and the environmental assessment, provide sufficient support for the Director's condition. We disagree.

We find nothing in the "Right-of-Way/Temporary Use Permit" or the environmental assessment which addresses the effect that any diversion above the sculpin pool might have on the sculpin. Nor was there evidence submitted by Hardy, the IDWR or the protestants regarding the consequences of any diversion. As noted by the district court, there was no evidence submitted, outside a general conclusion that the sculpin are sensitive to water changes, as to what might be required to protect the sculpin pool. There was no quantifiable measure of variance stated within the condition, and without a variance, any diversion of water above the sculpin pool would affect the elements listed in the condition, making the condition "difficult if not impossible to measure and satisfy."

Mr. Cordell testified that the purpose of the BLM conditions was to keep Hardy's right-of-way in compliance with the BLM's stated management goals regarding its ACEC classification of the Box Canyon Area. Although the Director may well con-

clude that those elements of the public interest affected by Hardy's actions and the BLM's goals are consistent, any conditions imposed by the Director must be supported by the evidence. The Director cannot rely on the conditions imposed by the BLM. While it is true that Hardy will have to comply with the BLM condition in order to maintain his right-of-way, the Director as the agent of the State of Idaho, has no interest in the agreement made between BLM and Hardy.

 As noted earlier, if the record is insufficient to support the agency's decision, we can reverse the decision or remand the case for further proceedings. *Dovel v. Dobson, supra; Idaho County Nursing Home v. Department of Health and Welfare*, 120 Idaho 933, 821 P.2d 988 (1991); *Love v. Board of County Commr's*, 105 Idaho 558, 671 P.2d 471 (1983). In this case, we feel the better approach is to remand the matter to the Director for further proceedings to determine what effect and to what degree Hardy's diversion above the sculpin pool might have on the sculpin, and in light of such findings, to determine what conditions are necessary to protect the sculpin pool and the public's interest.

## IV.

### INSTALLATION OF A MEASURING DEVICE

 The Director, in granting Hardy's amended water permits, ordered that the amount of water authorized to be diverted at the new point of diversion was not to exceed the amount of water available for diversion at the new point of diversion less the required 75 c.f.s. bypass flow. To implement this order, the Director required Hardy to submit plans for a headgate, measuring device and controlling works to be approved by the IDWR prior to construction of Hardy's project. The Director also required that the plans "include a means of assuring that the 75 c.f.s. bypass flow can be maintained at all times."

Hardy argues that because Box Canyon is not an adjudicated stream and, as such,

there is no watermaster to control distributions from the stream, there is no need to require Hardy to install a measuring device beyond that required by the BLM for the 75 c.f.s. bypass flow. However, the BLM's interest is in how much water is maintained past the point of diversion. The state's interest is in how much water goes into the proposed diversion, and as stated earlier, the state has no interest in the agreement between BLM and Hardy. Therefore, so long as the Director's actions are within his authority, the condition will be found to be appropriate. In this case, I.C. § 42–701 states that "[t]he appropriators or users of *any public waters of the state of Idaho shall maintain to the satisfaction of the department of water resources* suitable headgates and controlling works at the point where the water is diverted...." I.C. § 42–701 clearly authorizes the Director to require that Hardy maintain a measuring device. Accordingly, we uphold this condition.

## V.

### RELINQUISHMENT OF POINTS OF DIVERSION BELOW THE SCULPIN POOL

At the hearing to amend his permits, Hardy stated that there would be no need for him to use his previously approved points of diversion at and below the sculpin pool once the proposed point of diversion was approved. Accordingly, the Director granted Hardy's application to amend on the condition that Hardy relinquish his points of diversion at and below the sculpin pool when all the necessary approvals for use of the new point of diversion are obtained. Hardy appealed this condition to the district court, arguing that there was some confusion as to whether the necessary approvals included the required financing of Hardy's project. The district court removed the condition stating:

There is nothing in the record or in the findings of the IDWR to indicate that any of the environmental considerations would be impaired if Hardy was permitted to defer his decision on the actual

point of downstream diversion to be utilized until he has at least fully completed the engineering and financial feasibility work, or more practically, has actually commenced the diversion financially intended.

At oral argument before this Court, counsel for the IDWR agreed that relinquishment of the points of diversion at and below the sculpin pool would only need to occur once Hardy has put the water from the new point of diversion to a beneficial use. With this agreement, the issue before us has become moot.

## VI.

## CONCLUSION

In conclusion, we hold that the Director properly considered the local public interest in reviewing Hardy's application to amend his water permits under I.C. § 42–211, and that the protestants' interests in this case were properly considered. We also hold that while the protection of the sculpin pool was an element of the public interest which the Director could consider, the Director's condition regarding the protection of the sculpin pool was not supported by the evidence and therefore we remand the matter for further proceedings. Finally, we uphold the authority of the Director to require Hardy to install a measuring device at the proposed point of diversion.

In view of the fact that IDWR prevailed on some issues and Hardy on others, both parties shall bear their own costs and attorney fees.

McDEVITT, C.J., BISTLINE and TROUT, JJ., and FULLER, J. Pro Tem, concur.